Good morning, your honors. May it please the court, Daniel Osborne on behalf of the appellants, Fernando Ruiz and approximately 250 other truck drivers who operated here in California, and I would like to reserve three minutes for rebuttal. Our appeal raises three issues. I would just like to cover two of them here this morning for the next 12 minutes or so. First is that California law should have been applied to the trial that was conducted in this case. And second, that the district judge erred in failing to consider the cumulative weight of the evidence that was presented during that trial. As to California law, we did not urge it below. However, under Kimes v. Stone, this court can consider issues raised for the first time on appeal. There were three exceptions that permit that. Our papers articulate, and with the assistance of the two Amici briefs that were submitted, articulate why we satisfy each of those three exceptions. Any one of them will do. In particular, I would emphasize exception number two, which is a change in the law after the notice of appeal was filed in this case, and I'm specifically referring the Court to its decision, its 2010 decision in Narayan v. EGL, which was another case involving truck drivers. Is that really a change in the law, though? I mean, there's no indication in that decision of this Court that it was making new law or changing the law. I think what the Court was doing, Your Honor, is confirming California's interest or the interest in allowing California law to control California labor claims or claims brought under the California Labor Code. So it might not have been a 180-degree change in the law, but it certainly suggested and stressed that in the instances where there's a choice of law clause, if that choice of law clause is inconsistent with California's interest in basically protecting its workers, that California was going to be able to basically apply its laws to make sure that its workers were protected. Well, let's assume that we should take up the issue. Where doesn't Georgia law apply, nonetheless? Why doesn't Georgia law apply? Well, again, we have this choice of law provision, but all of the events leading up to or relating to the contracts with the drivers and the company relate to California. All the drivers worked in California. The contracts were signed in California. All of the work was performed in California. Georgia really has no connection to this case except for the fact that it was the headquarters of the defendant. So if you just look at the choice of law analysis, that's how that comes down in terms of in favor of California. The big difference is, and this is why we urge the Court to consider this, there's a presumption under Georgia law that if a contract says you're an independent contractor, you're an independent contractor unless the employee can rebut that presumption. Under California law, there's a different presumption that plays heavily in the employee's favor and the worker's favor, and that is once the employee shows that he has provided services to the employer, the employer then has to, bears the burden of proof if he wants to establish that the employee was affected. Didn't the district court below, though, say that even without the presumption, even if the presumption didn't apply, that the preponderance of the evidence showed the independent contractor's status after going through all of the factors and a review of the facts? Yes, Your Honor, and that leads very nicely into my second point, which is while the district court, so why shouldn't we trust the district court's statement that it found for the independent contractor's status even without applying this presumption? Your Honor, because I think effectively what the district court did was it looked at the various factors. There's these common law factors, and there were also about a half a dozen other aspects of the relationship that the court looked at, and when you read the opinion, you see a lot of acknowledgment of various facts presented by the plaintiffs, showing control over the means and manner of the performance of their work, and then you see this sort of retreat or kind of taking back or diminishing or qualifying that evidentiary showing from the plaintiffs, and basically the trial judge treated each element or factor or aspect of control as if we had to establish that aspect or factor of control by a preponderance of the evidence. Instead of gathering it all together and saying, okay, this is all of the evidence we have, when you read the opinion, you see, well, yes, the plaintiffs have established this particular fact, but it seems to be countered by this particular fact, and in doing so, she gave no weight to that particular fact. For example, if you take the fact that the drivers had to set up their own business, the trial court acknowledged that the drivers, as a prerequisite for going to work for Affinity, had to set up a DBA, had to set up a fictitious business, had to complete a bunch of paperwork. The trial judge acknowledged that that was a requirement by the employer. She acknowledged that the employer facilitated the paperwork, basically did everything except sign the paperwork. Those are good facts establishing control on behalf of the plaintiffs, but then she retreats and says, but at the same time, since these folks were running a business and they had the potential to make profit, I'm going to hold that against them. Since they decided what routes they could take, I conclude that that doesn't show or doesn't establish control. Since the drivers could establish how much they were going to pay their helpers, that doesn't establish control. When she was all said and done with that, she basically gave no weight to the fact that the company had required the drivers to set up their own business, thereby establishing control over the manner in which they were going to work. I'm not sure I understand how that fits into the presumption aspect of it. Didn't the district court consider all of the common law factors that it would have considered even had California law been applied and at some point in the opinion say, even without this presumption, I find that preponderance of the evidence shows the independent contractor's status? Yes, Your Honor, and I'm probably not articulating this very well, but let's assume that the presumption, let's assume that the district court has said there's no presumption or you've met the presumption. I still find that on the evidence that was submitted, you haven't shown by a preponderance of the evidence that these folks were employees. My point is that when she was presented with all of this evidence, rather than considering it in the aggregate, the cumulative effect of all that evidence, she looked at one piece at a time and basically discounted it 100% if she didn't believe it. So for example, this point about establishing a business, there's a give and take. She definitely found that some of that favored the workers and that some of it favored the company and then basically gave no weight to the plaintiffs at all, just discounted it 100%. Some weight should have been given for that. Well, let me ask you this. Suppose we agree with you and conclude that California law should apply here, and if she were looking solely at California law and just apply California law, is there any, is it reasonably possible that she'd come out with a different conclusion? Well, it's hard to predict because the trial would have been presented quite differently with the presumption shifting the burden then to the defendant. So, I mean, obviously we think that she would have. The employer would have. Well, let me ask you, let me put it, let me change it just a little bit. Is there anything, is there any other evidence that either you or defendants would have produced to comply with California law? I'm not sure there is, Your Honor. In fact, I'm not sure there's a great deal of dispute among the parties here as to the evidence that came in. I think it's really the treatment and the characterization of that evidence that forms the basis of our appeal. And, again, our position that she didn't, the judge didn't consider this in the aggregate. She sort of looked at the different factors, and if a factor didn't weigh in our favor 100% she didn't do it. That doesn't depend on whether California or Georgia law applies. Your fault with the district judge's approach. I mean, it sounds to me like you're saying it doesn't really matter whether Georgia or California law applied. The district judge got it wrong anyway. Certainly that's our position, and we think that the trial would have played out quite differently, too, because it would have been the employer's burden to come in and establish independent contractor status. Well, that's what I was asking you. What evidence? I mean, is there any other evidence out there that they wouldn't have, that they would have presented under California law? I mean, I'm going to ask them that question, obviously. But was there any evidence you would present that you didn't present under California law? No. No, Your Honor. There's not. I mean, I can't tell you that the evidence that came in would have been different. I can tell you that it would have been connected. But it would have been presented quite differently. Isn't that right? The presumption drops out no matter what at some point. Yes. And then you just get down to preponderance of the evidence. The judge is just weighing the evidence. Yes. And we had to take issue when the court applied. Hold on. Judge Ferguson. Yes. I mean, you know, looking at reality, Georgia, as I look over these materials, favors the independent contractor status, and California, and I believe also under federal law, favors the employee-employer status. And so one of the things that's crucial, you know, I've had a number of these cases in the past, and the controls, you have to look at the controls that the employer emphasized. And, I mean, there's a plethora of them. What I have here, after each meeting, affinity required that a supervisor check the driver's truck, the truck to ensure that deliveries were ready and loaded properly, and that no appliances were left on the dock. They also checked the uniform. All right. Affinity required drivers to wear a specific uniform. They provided the uniform. They charged the drivers for it by taking money out of their paycheck. And affinity had ruling requirements, including that tattoos and ear piercings wouldn't be covered. And most drivers leased their trucks from affinity, and those trucks had affinity's name, motor carrier number on the door, and affinity would automatically deduct $250 a week from a driver's paycheck to pay for the leased truck. Affinity told the drivers to leave their keys on the MDO in case affinity needed the truck to run another delivery. When drivers were not paid for the use of their truck, then it was used by affinity. For other such deliveries, drivers were not allowed to take the truck home. Affinity required drivers to carry insurance for their leased truck. Drivers could apply the insurance to affinity and would receive a certificate of insurance. Some of the drivers saw the entire insurance policy, and affinity deducted money for insurance from a driver's paycheck. Affinity required drivers to carry worker's compensation insurance. Affinity provided the worker's compensation insurance, but most drivers did not know who the insurance company was. Most drivers never saw the worker's compensation policy, but affinity deducted money from their paycheck. Drivers could not change their delivery route unless affinity approved. So it was affinity that decided what the route was. After each delivery, affinity required drivers to call an automated spheres customer service center. The drivers had to contact affinity supervisors after every two or three deliveries to let them know the deliveries had been made. And affinity engaged in weekly follow along. A follow along was when an affinity employee followed a driver to ensure that the driver was in uniform and was using proper delivery techniques. And affinity required each driver to have a helper on their truck with them. Affinity had to approve helpers and any second drivers by submitting them some background checks. Drivers decided how much to pay their helpers, and affinity advised the drivers what a reasonable amount would be. Affinity controlled the schedules of the drivers. Affinity employee would call the driver the day before to tell him that he was working the next day. Drivers' routes were based on scores they received from spheres customer service. The higher the score, the higher the priority in selecting routes. Spheres conduct the surveys and the ratings are put into spheres' database. Affinity accesses the spheres' database and evaluates the scores to measure delivery statistics. Affinity used these surveys to motivate the driver and has used similar surveys with companies other than spheres. Affinity has to approve any time of request. Sure sounds to me like these folks are not independent contractors. It seems like almost everything they do, from their haircuts, their tattoos, whether they can take a day off, if they're going to pay their helpers, insurance they have to pay, you know. Affinity controls it all. And Affinity even has the use of the vehicle when it's not used by the driver. They actually leave it there at the truck dealer. So I've never really seen one complete list of controls that sound almost absolute. That's just my take of it. And the whole purpose of this is to create this independent contractor relationship so that the respondeat superior doesn't get in. And then it's deployed. It's deployed. And these people don't work anywhere other than California. They're on California's roads, on California's freeways. They pay taxes, I'm sure, to California on their vehicles. So it seems as if they were born in Georgia, but sound to me like they're California, boom, boom. And, Your Honors, all of that came in at trial. And so what we've articulated in our brief is that, and I know that amount of time will be very quick, is Affinity took great pains to set up what looked like an independent contractor relationship with the contract document by requiring the drivers to set up DBAs. But it's sort of like one of those Hollywood movie sets with the old western towns where you have the saloon and the hotel, and you go walk down the street, but when you look behind it, it's just propped up by two-by-fours. There was nothing behind the contract and the DBA. That was all just a consequence. That's not a Hollywood set. It's just a champion's village. Okay, why don't we hear from the appellees from Affinity. May it please the Court, I'm James Hanson. I represent Affinity Logistics and represented Affinity during the trial. The question to be answered in this case is whether the district court's determination that the contractors were independent contractors was clearly erroneous. The thing that has been forgotten through the plaintiff's briefs is this. Mr. Ruiz worked for about a month and a half, was injured. He then hired another driver to do his work for him. He profited off of the work of another driver driving the truck that he rented with a helper he hired. He determined the wages to be paid, the way they should do it. He showed up every day to make sure that his driver and his helper loaded the truck correctly so there would be no damage claims. When there were problems with the deliveries during the day, Affinity called the owner of that business, R&S Logistics, which was the plaintiff, and dealt with the problem through the owner of the business, Mr. Ruiz, and he dealt with the problems of his own employees, including firing one who was not operating efficiently, was making too many personal phone calls. He operated like that where he did not do any of the work but instead profited off of the work of others. The other contractors who testified all ran multiple trucks. Mr. Ruiz did too. These are people who set up their own independent businesses in the trucking industry, and the use of owner-operators and fleet owners has been in existence. There's a Supreme Court decision from 1952, I believe, regarding the federal leasing regulations in which the U.S. Supreme Court acknowledged that owner-operators had been around for years and years and years, going back to probably 1935. Counsel, may I interrupt you for a minute? Yes, Your Honor. What you're saying is that Ruiz is acting more than the capacity of a farm labor contractor. I don't see the connection there, Your Honor. He had the opportunity. What you're saying is that all he's really doing, he's providing workers to run affinities trucks. That's what you're telling me. Your Honor, this case, though, is not about the farm worker hired by the person that you're talking about. We're actually talking about the person who was hiring the people and running his own business. There were some that ran multiple trucks. That's what a farm labor contractor does. If the owner of the field or the asset gets in there and has detailed instructions on how this is to be done, how that is to be done, then under our case law, I have a case on this. Under our case law, the grower, the owner, the owner of the asset is responsible. What if Mr. Ruiz didn't pay the driver and the helper? He did, Your Honor. He set up his own bank account and paid all of the taxes. I just ask you, what if Ruiz had these guys working, he got money from affinities, and he didn't pay these people that are doing the work for him? Then who would be responsible? He would be responsible, Your Honor, because he's the employer of those employees. He would be responsible, but he's gone, and the people that own the asset who provided all the details of the labor, how the work should be done, what the clothing ought to be, what the production ought to be, and all that. If the owner of the asset does that, then the owner of the asset, the owner of the asset is liable, because the owner of the asset takes the side and controls. That's all it comes down to. These are all laws to deprive working people of the benefits that would flow to the employee-employer relationship. Now, look here. As far as what the district judge did, we know the contract specified, George, the case was brought down a point, because all the work was done down a point. A federal court putting in diversity looks for the law of the foreign state when making a choice of law of determination. Here, that foreign state is California. Louise brought Steve in California. Then, under California's choice of law rules, there are three steps. California will enforce the clause in the contract when the chosen state, Georgia, has a substantial relationship to the party. Well, I don't see much of that here. All we have here is affinity. It's incorporated in Georgia and has its principal office in Georgia, and it's that that step that the district court stopped. The district court didn't go into the other factors, and that is whether the application of the chosen state law, Georgia, is contrary to the fundamental policy of California. And I believe it is. And three, if the chosen state law, that's Georgia,  the court evaluates whether California has a materially greater interest than the chosen state, Georgia, in resolving the issue. I think California does. I don't know what's going on here. These people live here. They work here, all the rest of it. Let's see, the district judge cut it off at the end of number one. They'll have numbers two and three to go. And then the others. Well, this is very, very, these things get very, very, very complicated. Judge Peterson, can I follow up on that? Let me just ask counsel, why doesn't California law apply here? Your Honor, this was one case in which the plaintiff, appellant in this case, agreed to the application of Georgia law throughout. There is not a change in the law. What the plaintiff did was come along for the first time in his appellate brief and argue that California law applies. He didn't preserve the error below. In fact, he invited the error by agreeing to the application of Georgia law. Now comes and says that California law should apply, but it was in a footnote that he does it without argument. It was the amici who makes the argument for him, and that isn't proper. They can't make his argument. He does. He abandoned it, even in appeal, because he didn't argue the point of why it should apply. And then he admits today that EGL was not a change in the law. It was just the application of choice of law principles. So he has waived any argument that Georgia law should not apply. It's not entirely clear that he waived it, but whether we should take it up or not is another question. But we do recognize there are exceptions to, you know, the doctrines. Correct. It's purely a question of law. What about the question of whether if California law did apply, whether there would have been any difference in the evidence presented? The appellant says no from their point of view, that the evidence would have been the same. How about from Affinity's point of view? I believe the evidence would have been the same. I think the result would have been the same. The court considered, the district court below considered the common law factors and came out to them as being 7-1-2, two being neutral, one for employee status and seven in favor of the IC status. So I don't think the result would have been any different. The presumption, as Your Honor noted, would not have, did not make any difference. That's a red herring argument. Because once you get in and you introduce the evidence, it might only be an issue if the evidence was equal. And you were looking at the scales of justice after putting all the factors on and said that the evidence was equal, then the presumption may apply. But other than that, the court found that the preponderance of the evidence favored IC status, not employee status, so the presumption had no effect. Well, Your Honor, one thing that is interesting, when you read the district court's conclusions of law, I mean, she does rely heavily on Georgia law. She does, because the analysis of Georgia cases throughout. No question, she does. And she considers I didn't try to go through and figure this out. If you could come to the same result looking at all the relevant California cases. I think everything that the plaintiff argued that could possibly be considered control by affinity are nothing more than Sears requirements, not affinity requirements, nothing more than government regulation requirements, not affinity requirements, and that what she did was consider the overall aspect of the businesses that were being run by these contractors, what they were doing. They were running their own trucks. They were running multiple trucks. They were running days when they weren't working and hiring other people to work. One of them was running up to four different trucks. Those are independent businesses. They invest in capital. They buy trucks. They lease trucks in accordance with the federal leasing regulations. And they hire and pay their own employees. They decide what to pay them. That affects the profitability of their own business. Was there any evidence at trial about the business purpose of this scheme? And I say scheme not in a derogatory sense, but just the way it worked. In other words, what was the business purpose by which affinity decided to go this route rather than just have a simple employee? In the trucking industry, and I've been involved in it for 30 years now, what happens is the trucking companies operate in different, they have different business models. One is to be a non-asset base. They don't own or operate any of their own trucks. They use owner-operators, fleet owners, what was called in the FedEx cases a multiple work area operator, an MWA. That's what these people are. If you want to compare it, as Plaintiff tried to do, to Estrada, these are the MWAs who ran multiple trucks with multiple employees and drivers and were specifically excluded from Estrada. We've had a situation where Mr. Ruiz is claiming to be an employee during the time period when he was not even working, he had hired other people to do the work for him, he was being paid for the work of others, and he was paying the people he hired to do the job. This is a typical small business and is not one in which it is in any way improper. It is done frequently in the trucking industry that people hire owner-operators, fleet owners, to actually do the delivery. Affinity acts more like a logistics in the sense of setting up what deliveries have to be made. So Sears contracts with Affinity to provide the trucks to deliver merchandise to homeowners? To have the deliveries get done, yes. That's what they do. What is the business purpose from Affinity or other similar operators? What is the business purpose? Is it simply to escape the obligation of paying employee benefits? No, Your Honor. Affinity has its own employees that provide the administrative support to the operation and handling of the Sears business and the other businesses that they service, the other customers. It is nothing more than providing a service to say, Sears, you don't have the ability to do the trucking yourself because you're a retail operation. We are involved in the logistics of getting deliveries. Well, I know why Affinity operates this business, but why doesn't it just hire the drivers like Mr. Ruiz? That is a perfectly acceptable business model in the trucking industry. It is one that Affinity has never operated under. They don't want to pay all the expenses. They don't want all the regulations, all the expenses. They'd rather not have employees because they don't want to pay employee, state-mandated employee benefits like Mr. Ruiz and other class members are seeking. No, I believe that what it is is that when you have differences in the amount of work, you can better, if you don't have to have the expense of having equipment, you end up having people and using them when you need them, and you don't have that obligation on an ongoing basis to supply in the times when things are low. You only contract with enough people to get the work done, and when there's less work, you have less people working. Does Affinity help finance the trucks? Affinity does not finance the trucks. Affinity facilitates the leasing arrangement for the drivers. The drivers end up paying those contractors. When you say facilitates, what do you mean by facilitate? They go to Rider and work out a favorable lease price for them. Those drivers can either take that and get the equipment through that lease with Rider or they can move out. Does Affinity guarantee the performance of the payments? I'm sorry, Your Honor. Does Affinity guarantee the performance of the payments by the truckers? It does not guarantee the payments of the drivers, no. So if the drivers don't pay the lease payments, Rider goes after the drivers? Rider does not go after the drivers because the leases are based on what trucks are used. So only if the driver is using it and not paying it would there be any type of an obligation. I'm not aware of that ever happening. Why are the trucks left at the yard and Affinity can use those trucks and they're left at the yard? The fees are there. What's the purpose of that? Judge Pregerson, I'm not going to say that every case has 100% good facts. That was not a good fact. There's no other way to explain that. But what the district court did was consider all of those facts together with all the other facts and found that indeed the contractors were running their own businesses despite the fact that they may have to return the trucks at the end of the day and that it was strongly discouraged to take them. That's kind of an odd situation, though, isn't it? I mean, that's one fact. I may be mistaken. I thought that Affinity required the trucks be kept in Sears' secured lot to prevent vandalism to the trucks. That was their argument, at least. Right. Did the record show that the trucks were subject to being used by other drivers? It happened on occasion. Yes, it did. When a truck broke down. The issue of the trucks being parked at the Sears' lot was that apparently at one time people had taken trucks home. They had been vandalized where they had parked them. And not everybody has the... Graffiti had been put on them. What did I say? You said vandalized, but I thought that vandalism was graffiti. Yes, there was graffiti on the trucks, and Sears doesn't want their deliveries made to their customers' homes with graffiti on it. And so it was strongly discouraged for them to take them home. Many of those drivers, the evidence came out, don't even have a place that they can park it on the street because it is a big, you know, it's a 24, 26, 30-foot box truck. You can't park it on a street legally overnight. So they've got to have a place to park it, no better than a secure place like Sears so you don't have to worry about it being vandalized or graffiti put on it. Yes. Well, I see a lot of those big trucks parked overnight on 50th Boulevard and on other streets in the valley where I live. And that may be a case where it was proper. One last point, you're over your time, so this is it. What the plaintiff is asking the court to do in this appeal is to reweigh the evidence and substitute its judgment for the considered judgment of the district court, which sat and listened to all of the evidence, considered all of the evidence, and reached its conclusion. And that decision was not clearly erroneous. Okay. Thank you, Your Honor. All right. Thank you. You had a few minutes for rebuttal. I want to go straight under that. I'll be very brief. Thank you. Affinity financed the trucks. Affinity had a contract with Ryder for a bunch of trucks. Affinity paid Ryder for those trucks. Then who did the drivers pay? Affinity. They had money deducted from their checks every week, $357 in most cases every week. Off the top? Off the top. These were not businesses. They were required to set up, the drivers were required to set up DBAs. These were not traditional small businesses. Most of the drivers testified, I think four drivers testified at trial. They testified that they would have never set up a business had it not been for this requirement to do so. Is it not true that they did profit from hiring other drivers, such as Mr. Ruiz? I mean, he made the difference between what he was being paid and what he paid his driver. As Mr. Hansen said, not every case has perfect facts. Yes, but it was an incremental difference. Like you just pointed out, Judge, it was simply the difference between what he was paid by Affinity and what he paid his driver. Most of these drivers, they also testified that they only ran multiple trucks at the urging of Affinity. They didn't want to earn multiple trucks. In fact, I think one of the drivers testified that he couldn't wait to get out of it because he was actually losing money. Again, they have to pay $357 a week for the truck. They had to pay for insurance. They had to pay for the tools and equipment that came along with the truck. These were not businesses. These people did not invest their own capital. Everything was provided to them. Most of them got advances when they started working for the fuel that they had to put in the truck. They didn't capitalize their own business. They didn't have their own customers. Sears was the only customer. If they stopped driving for Affinity, they couldn't pick up the next day and have customers. It was Sears. They weren't even allowed to drive for anybody else. Sears was their only customer. And when they left, if they terminated, they didn't have a truck because, again, that was a truck that they leased from Affinity. These were not owner-operators, the kind that you and I think of. And this point about not being able to take the truck home, that's a significant fact. If these people had their own business, they were operating their own business, why wouldn't they be able to take the truck home? Okay, I understand the concern about vandalism, but that's the business owner's obligation. You paid for the insurance on all these trucks. That was just part of the $350? I can't remember if it was part of the $350 or if it was an additional off the top, but the drivers paid for it. You've got to make it 30 seconds to wrap it up. I think that's it, Your Honor. Okay. I think that the principal argument that the district court relied upon is this notion that these folks were running their own business, and they simply weren't. All right, thank you. Okay. Release versus Affinity Logistics Corporation is submitted at this time. Thank you, counsel. We appreciate your arguments. Thank you. Thank you, Your Honor. Very good argument. Both sides. Thank you, Judge. Our next case for argument is we're going to jump down. Let me just clarify that the next case on the calendar is Doan v. Astry. That's submitted on the briefs. But our next case for argument is Kazanacom v. Turin. There are actually three appeals in that matter, and we've submitted one of them. 10-55922 is submitted. We'll hear argument on the other two.
judges: Jones, Pregerson, Paez